1  SHEILA K. SEXTON, SBN 197608
2  BEESON, TAYER & BODINE, APC
   1404 Franklin Street, 5th Floor
3  Oakland, CA 94612-3208
   Telephone:    (510) 625-9700
   Facsimile:    (510) 625-8275
4  Email:    ssexton@beesontayer.com

5  Attorneys for Plaintiff Teamsters Local No. 624

ORIGINAL
FILED

MAY 1 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

6

7              UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  GENERAL TRUCK DRIVERS,
    WAREHOUSEMEN & HELPERS UNION
11  LOCAL NO. 624, INTERNATIONAL
    BROTHERHOOD OF TEAMSTERS,
12
                              Plaintiff,
13
          v.
14
    CLOVER STORNETTA FARMS, INC.,
15
                              Defendant
16

Case No. **C08-02463 MEJ**

**ADR**

**COMPLAINT TO COMPEL ARBITRATION**

17

18      Plaintiff GENERAL TRUCK DRIVERS, WAREHOUSEMEN & HELPERS UNION

19  LOCAL NO. 624, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, ("Local 624") hereby

20  complains and alleges as follows:

21                          **JURISDICTION**

22      1.    This is a Complaint to Compel Arbitration pursuant to a written collective bargaining

23  agreement between an employer and a labor organization representing employees in an industry

    affecting commerce. This Court has jurisdiction over this action pursuant to Section 301(a) of the
24
    Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).
28
                             **VENUE**
26      2.    Pursuant to Section 301(c) of the LMRA, 29 U.S.C. §185(c), venue is appropriate in
27  the Northern District of California as the collective bargaining agreement between Plaintiff and
28  Defendant was executed in and governs the terms and conditions of employment for employees

COMPLAINT TO COMPEL ARBITRATION

1

80106.doc

represented by Plaintiff and working in this judicial district. In addition, the events or omissions giving rise to Plaintiff's Complaint occurred in this judicial district.

## INTRADISTRICT ASSIGNMENT

3.    Assignment of this matter to the San Francisco or Oakland Divisions of this District is appropriate because a substantial part of the events or omissions which give rise to the claim have occurred in Sonoma County.

## PARTIES

4.    Plaintiff Local 624 is an unincorporated labor association whose principal place of business is located within this judicial district in Santa Rosa, Sonoma County, California. Local 624's officers and authorized agents represent and act on behalf of its members within this Judicial District.

5.    Defendant Clover Stornetta Farms, Inc. ("Clover") is engaged in business within the State of California with a place of business located in Petaluma, Sonoma County, California. Clover conducts business in the Northern District of California by, *inter alia*, operating a dairy in Northern California.

6.    At all times material herein, Clover has been an employer engaged in an industry affecting commerce within the meaning of the Labor Management Relations Act, as amended (29 U.S.C. §152(2)(6) and (7)).

## CLAIM FOR RELIEF

7.    In or about April 2005, Local 624 and Clover entered into a written collective bargaining agreement (the "Agreement") effective for a term of April 1, 2005, through March 31, 2009. The Agreement covers Clover's production, distribution and driver employees employed at the Clover facilities located in Sonoma County. A true and correct copy of the Agreement is attached hereto as Exhibit A, and incorporated herein by reference.

8.    Section 41 of the Agreement contains an arbitration procedure for the resolution of disputes arising under the Agreement. Under this provision, if the parties fail to resolve any dispute under the Agreement, "both parties shall proceed to create a Board of Adjustment for the purpose of submitting to it such matters of difference." If the Board of Adjustment is deadlocked, "either party may refer to the matter to a neutral arbitrator," whose decision shall be final and binding.

9.     On or about December 27, 2006, Local 624 filed a timely two-part grievance, one claim protesting Clover's failure to pay certain required health and welfare contributions, the subject of this lawsuit. Specifically, the Employer has refused to honor its obligation to contribute fifty percent of its employees' out of pocket monthly required health and welfare plan contributions for a six-month period. *See,* Exhibit B, attached hereto, Agreement and Letter of Understanding between Clover and Local 624.

10.    Local 624 requested that the parties waive the Board of Adjustment stage of dispute resolution and submit the matter directly to an arbitrator. Clover initially requested that a Board of Adjustment meet to consider the matter, but later agreed to postpone the convening of a Board of Adjustment while the parties continued efforts to negotiate settlement of the matter.

11.    On March 29, 2007, the parties met and resolved one of the two issues asserted in the December 27, 2006 grievance. Local 624 suggested that the parties submit the unresolved matter to a mediator, but the parties could not agree on a mediator. Without an agreement to mediate, the parties continued direct efforts to settle the matter.

12.    On November 2, 2007, Local 624 contacted Clover and stated its opinion that the settlement efforts had failed and that the case should proceed to the next step in the grievance process. In a November 27, 2007 letter, Clover stated that it would not arbitrate the dispute because it believed the negotiations had taken too long and that Local 624 had therefore waived its right to contest the matter.

13.    Local 624 has complied with the grievance and arbitration procedures set forth in the Agreement. By failing and refusing to comply with its obligation to arbitrate the dispute set forth in the grievance, as provided in the Agreement between the parties, Clover has violated the grievance and arbitration provisions of the Agreement. Unless Clover is compelled to arbitrate, as hereafter prayed, said violation will continue and Plaintiff and the employees it represents will be deprived of their contractual and federally protected rights to bargain effectively with Clover and to obtain the benefits of their collective bargaining agreement with Clover.

14.    In addition, Clover's refusal to arbitrate is not taken or maintained in good faith, well-grounded in fact or warranted by law. Accordingly, this is a proper case for an award to Local 624 of the attorneys' fees and costs incurred herein.

COMPLAINT TO COMPEL ARBITRATION

**WHEREFORE**, Plaintiff FREIGHT CHECKERS, CLERICAL EMPLOYEES AND HELPERS UNION LOCAL NO. 624, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, prays for the following:

1. That this Court issue an order compelling Defendant Clover Stornetta Farms, Inc., to arbitrate the matter raised in Local 624's grievance submitted to Clover on December 27, 2006, in the manner provided for in the Agreement;

2. Plaintiff's costs of suit and attorney's fees; and

3. To cooperate fully with Plaintiff in agreeing to a hearing date and making all appropriate arrangements for said arbitration;

4. For such other and further relief as the Court in its discretion deems just and equitable.

Dated: May 14 2008

BEESON, TAYER & BODINE, APC

By: _____

SHEILA K. SEXTON
Attorneys for General Truck Drivers,
Warehousemen & Helpers Union Local No.
624, International Brotherhood of Teamsters

COMPLAINT TO COMPEL ARBITRATION

4

80106.doc

**EXHIBIT A**

# CLOVER STORNETTA FARMS, INC.

P.O. Box 750369
Petaluma, CA 94975-0369
Phone (707) 778-8448
FAX (707) 778-0509

March 1, 2006

Bob Carr
Secretary-Treasurer
General Truck Drivers, Warehousemen &
Helpers Union, Local No. 624
1371 Neotomas Avenue
Santa Rosa, CA 95405

**Re:** **Clover-Stornetta Farms**
**Letter of understanding concerning replacement of North Coast**
**Trust Fund Plan 9T**

Dear Mr. Carr:

This letter is written to confirm the understanding of Clover Stornetta Farms, Inc., ("Employer") and General Truck Drivers, Warehousemen & Helpers Union Local No. 624, affiliated with the International Brotherhood of Teamsters ("Union") concerning implementation of Section 23, Health and Welfare, of the 2005-2009 collective bargaining agreement ("Agreement") between them.

The Employer and Union have agreed jointly to participate in a search to locate a replacement plan for the current North Coast Trust Fund Plan 9T for the purpose of providing hospital, medical, dental, drug and vision at a more affordable cost. As a mutual incentive to cooperate, the parties have agreed that:

1.      If the parties are unsuccessful in finding and implementing another medical plan by April 1, 2006, then in addition to the contribution rate provided by Section 23 of the Agreement, the Employer will be required to pay, for work months during the Contract Year beginning April 1, 2006 and ending March 31, 2007, fifty percent (50%) of the amount exceeding the cap that the Employer may require employees to pay from wages under Section 23(d).

2.      If the parties continue to be unsuccessful in finding and implementing another medical plan on April 1, 2007, then the amount exceeding the cap that the Employer may require employees to pay from wages will be restored to one hundred percent (100%) of the amount described in Section 23(d) for Contract Years beginning April 1, 2007.

A foundational assumption and precondition of the agreements made in this letter of understanding is that each party will participate actively and in good faith in an attempt to develop and propose a replacement plan without unnecessary delay. The parties acknowledge that neither party is able to perform its responsibilities in this regard without the full and open cooperation of the other in providing needed information about the details of any proposed alternative plan and employee needs and concerns.

Either party may submit a proposal for an alternative plan, or modifications to an earlier proposed plan, at any time. The negotiating committees for the parties will then meet in a timely manner on any proposed alternative for the purpose of negotiating the details and exchanging

011063.0001\748933.2

91 Lakeville Street    •    Petaluma, California 94952

Recycled Paper

Bob Carr
March 1, 2006
Page 2

views.  The committees will attempt to reach a joint recommendation for a replacement plan.  If a joint recommendation is reached to accept a proposed plan, the plan will then be presented jointly to a meeting of the company's bargaining unit employees.  The negotiating committees also will agree on a packet of information to be made available to all bargaining unit employees in advance of the meeting.

Prior to any vote by the bargaining unit on the recommended proposal, the Union will notify the Employer of the process by which the Union will conduct the vote.  If the plan is approved, the new plan will be implemented at the earliest available date.  If the recommended plan is not approved, either party may submit a revised proposal to the negotiating committees, and the same procedure will pertain to consideration of the revised proposal.

If this letter is consistent with your understanding, would you please date, sign and return one copy to me for our records.  Thank you for your assistance.

Very truly yours,

CLOVER-STORNETTA FARMS

Herm Benedetti
Vice-President for Human Resources

The following signature confirms the agreement of the Union to the understandings described in the letter above concerning replacement of North Coast Trust Fund Plan 9T.

Dated: 4/12/2006

GENERAL TRUCK DRIVERS, WAREHOUSEMEN & HELPERS UNION, LOCAL NO. 624

Bob Carr
Secretary-Treasurer

Dated: 4/12/06

GENERAL TRUCK DRIVERS, WAREHOUSEMEN & HELPERS UNION, LOCAL NO. 624

Ralph Miranda
President and Agent

cc:    Sylvia Bautista
       Stephen McKae, Esq.

011063.0001\748933.2

AGREEMENT BETWEEN

CLOVER STORNETTA FARMS, INC.

AND

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 624

(APRIL 1, 2005 – MARCH 31, 2009)

# TABLE OF CONTENTS

SECTION 1. RECOGNITION ............................................................................................. 1

SECTION 2. UNION SECURITY ....................................................................................... 1

SECTION 3. HIRING........................................................................................................... 1

SECTION 4. INDEPENDENT CONTRACTORS ............................................................ 1

SECTION 5. UNION PRINCIPLES ................................................................................... 2

SECTION 6. HOURS .......................................................................................................... 2

SECTION 7. DAYS OFF ..................................................................................................... 3

SECTION 8. OVERTIME RATE......................................................................................... 3

SECTION 9. STARTING TIME AND TIME BETWEEN SHIFTS ................................. 4

SECTION 10. HOLIDAYS .................................................................................................. 4

SECTION 11. VACATIONS................................................................................................ 6

SECTION 12. MEDICAL LEAVE OF ABSENCE .......................................................... 7

SECTION 13. LEAVE OF ABSENCE .............................................................................. 8

SECTION 14. NIGHT SHIFT PREMIUM ........................................................................ 8

SECTION 15. WAGES ....................................................................................................... 8

SECTION 16. UNIFORMS ................................................................................................. 8

SECTION 17. COMPANY MEETINGS ............................................................................ 8

SECTION 18. BOND ........................................................................................................... 9

SECTION 19. PHYSICAL EXAMINATION..................................................................... 9

SECTION 20. CREDIT ........................................................................................................ 9

SECTION 21. DISCHARGE OR SUSPENSION ............................................................. 9

SECTION 22. LAYOFF NOTICE ...................................................................................... 10

SECTION 23. HEALTH & WELFARE............................................................................... 10

SECTION 24. PENSION...................................................................................................... 11

SECTION 25. 401(k) PLAN................................................................................................ 13

SECTION 26. RIDERS ON TRUCKS ............................................................................... 13

SECTION 27. SENIORITY AND PROBATIONARY PERIOD ...................................... 13

SECTION 28. VISITS BY UNION REPRESENTATIVES .............................................. 14

SECTION 29. BULLETIN BOARD ................................................................................... 14

SECTION 30. TIME CLOCKS ........................................................................................... 14

SECTION 31. VEHICLES ................................................................................................... 15

i

SECTION 32. MAINTENANCE OF STANDARDS ...................................................... 15

SECTION 33. MEAL PERIODS AND REST PERIODS ............................................... 15

SECTION 34. PROTECTION OF RIGHTS ................................................................. 15

SECTION 35. WORK IN TWO OR MORE CLASSIFICATIONS ............................. 16

SECTION 36. DONATIONS ....................................................................................... 16

SECTION 37. PROTECTIVE CLOTHING .................................................................. 16

SECTION 38. PAY DAYS ............................................................................................ 16

SECTION 39. REMITTANCE ADVICE ...................................................................... 16

SECTION 40. HANDICAPPED EMPLOYEES ........................................................... 16

SECTION 41. ARBITRATION ..................................................................................... 16

SECTION 42. LICENSES ............................................................................................ 18

SECTION 43. IMPROPER SOLICITATION ............................................................... 18

SECTION 44. TRANSFER OF COMPANY TITLE OR INTEREST ........................... 18

SECTION 45. JURY DUTY .......................................................................................... 18

SECTION 46. BEREAVEMENT LEAVE ..................................................................... 18

SECTION 47. EQUAL EMPLOYMENT OPPORTUNITY .......................................... 18

SECTION 48. JOB BIDDING ...................................................................................... 19

SECTION 49. ALCOHOL AND DRUG USE .............................................................. 19

SECTION 50. ALCOHOL AND DRUG REHABILITATION ...................................... 20

SECTION 51. DUES CHECK-OFF .............................................................................. 20

SECTION 52. TERM OF AGREEMENT ..................................................................... 21

APPENDIX A. WAGE CLASSIFICATIONS  HOURLY RATE

APPENDIX B.  ALCOHOL/SUBSTANCE ABUSE POLICY

011063.0001\748824.5

4/1/05-3/31/09

## CLOVER STORNETTA FARMS, INC.

THIS AGREEMENT is made and entered into this 1st day of April 2005 by and between Clover Stornetta Farms, Inc., hereinafter referred to as the "Employer," and General Truck Drivers, Warehousemen & Helpers Union Local No. 624, affiliated with the International Brotherhood of Teamsters, hereinafter referred to as the "Union."

## SECTION 1. RECOGNITION

(a)     The Employer recognizes the Union through its representative General Truck Drivers, Warehousemen & Helpers Union Local No. 624, affiliated with the International Brotherhood of Teamsters, as the sole agency for the purpose of collective bargaining for all employees working under the terms and conditions of this Agreement.

(b)     The Employer recognizes the right of the Local Union to designate shop stewards and alternates by appointment or election within the employees covered by this Agreement.

## SECTION 2. UNION SECURITY

Only members in good standing in the Union shall be retained in employment. For purposes of this Section "members in good standing" shall be defined to mean employee members in the Union who tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership. Non-members of the Union hired by the Employer must complete membership affiliation on or immediately following the thirtieth (30th) day of employment, and the Union agrees to accept said non-members into membership on the same terms and conditions generally applicable to other members. Upon written notice from the Union of failure on the part of any individual to complete membership in the Union as above required, or of failure to continue payment of dues to the Union, the Employer shall, within seven (7) days of such notice, discharge said employee.

## SECTION 3. HIRING

When new or additional employees are needed, the Employer shall notify the Union of the number and classification of employees needed and the Union shall have a reasonable opportunity to refer applicants for the vacancies to be filled. In the event that the applicants referred by the Union are not hired, the Employer agrees within twenty-four (24) hours of the date of hiring to notify the Union of the name or names of the persons hired.

## SECTION 4. INDEPENDENT CONTRACTORS

(a)     The Employer shall give written notice to the Union of any change in operations involving the subcontracting of delivery or hauling, and the Union shall be given a reasonable opportunity to discuss the matter with the subcontractor before the actual change in operations takes place. If subcontracting will not result in a loss of work for bargaining unit employees, the Employer will so advise the Union in the notice, and no further meeting will be required prior to

1

implementation. However, the Union may reopen the matter if such a work loss does in fact occur as a direct result of the subcontracting.

**(b)** The Employer shall give preference to any qualified employee who offers to purchase, as an independent contractor, any route for which a subcontract is to be awarded.

## SECTION 5. UNION PRINCIPLES

No employee shall be discharged or discriminated against for activity in or representing the Union or for upholding Union principles.

## SECTION 6. HOURS

**(a)** Eight (8) hours shall constitute a day's work for all classifications and shall be worked within not less than eight and one-half (8-1/2) consecutive hours nor more than nine (9) consecutive hours, except as provided below.

**(b)** Except as provided in paragraph (d) and (e):

**(1)** Any time worked in excess of eight (8) hours in any one day shall be overtime and shall be paid at the rate of one and one-half times the basic hourly rate, including the night shift differential if applicable.

**(2)** Hours of work on a sixth or seventh day of work in any week shall be paid at the rate of one and one-half (1-1/2) times the basic hourly rate, including the night shift differential if applicable provided that the employee has worked forty (40) hours in the week.

**(c)** Regular employees shall be guaranteed forty (40) hours of work or pay per scheduled work week at straight time. The holidays and vacation designated herein shall be counted as part of the guaranteed workweek even though no work is performed on such days. The guaranteed workweek for regular employees as provided herein shall prevail unless the employee is absent from work of their own accord, such as for unpaid leave of absence, sick leave or bereavement leave. The guarantee provided in this paragraph shall not apply in the event an employee quits or is terminated for cause.

**(1)** Employees recalled to work shall be offered a minimum of four (4) hours of work on any day they start to work.

**(d)** The Employer may establish a schedule of four (4) ten (10)-hour days or five (5) eight (8)-hour days for any given job upon giving at least two (2) calendar weeks prior notice to the Union. Except as provided in paragraph (e), a schedule of four (4) ten (10)-hour days will be on the following basis:

**(1)** Ten (10) hours shall constitute a day's work and shall be completed within ten and one-half (10-1/2) hours.

2

(2)     All hours worked in excess of ten (10) straight-time hours a day shall be paid at the rate of one and one-half times the basic hourly rate including the night shift differential, if applicable.

(3)     The Employer will attempt to provide employees with two (2) consecutive days off each week.

(4)     For purposes of calculating funeral leave, medical leave of absence and jury pay, a day shall consist of ten (10) hours (not to exceed forty (40) hours per week).  For purposes of calculating holiday pay, a day shall consist of ten (10) hours if the employee works less than forty (40) hours during the week and eight (8) hours if the employee works forty (40) or more hours during the holiday week.

(5)     Hours of work on a fifth, sixth or seventh day of work during a workweek will be paid at the rate of one and one-half (1-1/2) times the employee's basic hourly rate including any applicable night shift differential.

(6)     An employee who works on a holiday shall be offered ten (10) hours of work in addition to their holiday pay.

(e)     Except as provided in Section 10, the maximum overtime premium required under any provision of this agreement shall be at the rate of one and one-half (1-1/2) times the employee's basic hourly rate.

## SECTION 7.  DAYS OFF

(a)     All non-driver employees shall receive two (2) days off per week (consecutive if possible).

(b)     Days-off schedule shall be posted every thirty (30) days.  In the event scheduled days off are changed without seven (7) days prior notice, time and one-half (1-1/2) the basic hourly rate including any applicable night shift differential shall be paid to the employee for work on the scheduled day off.  This provision shall not apply in emergency situations, such as breakdown of equipment, power failure, act of God or illness or other unscheduled absence of an employee.

(c)     Days off not received in accordance with the foregoing shall be paid for at the overtime rate for the first eight (8) hours.  Hours worked over eight (8) shall be paid for at one and one-half times the basic hourly rate of pay including any applicable night shift differential.

## SECTION 8.  OVERTIME RATE

(a)     Except as otherwise provided in Sections 6(b), 6(e) and 11(c), an employee's hourly overtime rate shall be one and one-half (1-1/2) times the basic hourly rate for the employee's classification.  Whenever applicable, the night shift premium shall be added to an employee's basic hourly rate before calculating the hourly overtime rate.  Only one overtime rate shall apply at any time, so there shall be no pyramiding of overtime rates.

3

**(b)** Any delays in daily operations caused by circumstances beyond the control of the Employer, such as failure of power or breakdown of plant machinery or road equipment, shall not require the payment of overtime, except to employees who may be required to work during such delay interval. Provided, however, time spent by a driver who has a breakdown on the road and remains with the vehicle shall be considered working time for which the driver is entitled to be paid, including overtime pay when otherwise earned according to subparagraphs (b) or (e) of Section 6.

## SECTION 9. STARTING TIME AND TIME BETWEEN SHIFTS

**(a)** If an employee is required to return to work within ten (10) hours after completing his/her regular straight-time shift, the employee shall be paid at the rate of time and one-half (1-1/2) of the basic hourly rate of pay, including the night shift premium where applicable under Section 13, for all hours worked within such ten (10) hours. This provision shall not apply in emergency situations such as breakdown of road equipment, power failure, act of God, or illness or other unscheduled absence of an employee.

**(b)** Posted starting times may be changed if the employee is notified of the change by the end of his/her previous shift. If such notice is not given, the employee will be paid at the overtime rate for all time worked before and after his/her regular shift, unless the failure to give the required notice is due to conditions beyond the Employer's control, such as power failure, breakdown of machinery or road equipment, or act of God.

## SECTION 10. HOLIDAYS

**(a)** The following holidays shall be granted with full pay to all employees, except probationary employees, although no work is performed:

New Year's Day                                    Labor Day
Presidents Day (3rd Monday in February)          Veterans Day (November 11)
Memorial Day (Last Monday in May)                Thanksgiving Day
Fourth of July                                    Christmas Day

**(b)** An employee working on any of the above holidays shall receive a holiday benefit as follows:

**(1)** If eight (8) hours constitutes a day's work, the employee shall receive the holiday benefit of eight (8) hours multiplied by the employee's basic hourly rate of pay including any applicable night shift differential, and the employee shall also be guaranteed eight (8) hours work at the employee's basic hourly rate unless the employee voluntarily leaves work before completion of the eight (8) hours. Provided that if the holiday is New Year's Day, Thanksgiving Day or Christmas Day, production employees only shall instead receive the holiday benefit of eight (8) hours multiplied by the employee's basic hourly rate of pay including any applicable night shift differential, and the employee shall also be guaranteed eight (8) hours work at twice the employee's basic hourly rate unless the employee voluntarily leaves work before completion of the eight (8) hours.

**(2)** If ten (10) hours constitutes a day's work, the employee shall receive the holiday benefit of ten (10) hours multiplied by the employee's basic hourly rate of pay including

4

any applicable night shift differential, and the employee shall also be guaranteed ten (10) hours work at the employee's basic hourly rate unless the employee voluntarily leaves work before completion of the ten (10) hours. Provided that if the holiday is New Year's Day, Thanksgiving Day or Christmas Day, production employees only shall instead receive the holiday benefit of ten (10) hours multiplied by the employee's basic hourly rate of pay including any applicable night shift differential, and the employee shall also be guaranteed ten (10) hours work at twice the employee's basic hourly rate unless the employee voluntarily leaves work before completion of the ten (10) hours.

(3)     Notwithstanding the foregoing, in the event that the employee voluntarily leaves work on a New Year's Day, Thanksgiving Day or Christmas Day holiday before completing the employee's normal shift, and if more than one half of the employee's normal shift, excluding overtime, is worked, then the entire shift shall be considered to have been worked on that holiday. Otherwise, any straight-time and premium pay provided by this Section 10 shall apply only to the hours actually worked on that holiday.

(4)     If one of the above holidays fall on Sunday, the following Monday shall be observed as the holiday.

(c)     When a holiday falls on an employee's regular day off, the employee shall receive the holiday benefit of eight (8) hours pay at the basic hourly rate of pay. Provided, that if an employee normally is assigned to a ten (10)-hour shift, then when a holiday falls on the employee's regular day off, the employee shall receive the holiday benefit of ten (10) hours pay at the basic hourly rate of pay.

(d)     When a holiday falls during the employee's vacation, the employee shall receive an additional day off with pay or an additional day's pay at the discretion of the Employer.

(e)     A holiday not worked shall be counted toward fulfillment of the five (5) day, forty (40) hour minimum guarantee in Section 6 of the contract.

(f)     An employee is not eligible for holiday pay during the first one hundred twenty (120) days that the employee is on the payroll (see Section 26). An employee must work at least one (1) day in the holiday week in order to receive holiday pay, unless excused by the Employer.

(g)     The Employer may require a doctor's certificate or other satisfactory proof of illness for an employee who is scheduled to work on a holiday and fails to report to work as scheduled on such a holiday. If such a certificate is requested by the Employer but not provided by the employee within forty-eight (48) hours of returning to work, then the employee will forfeit holiday pay for that day.

(h)     An employee must work the scheduled day before a holiday and the scheduled day after a holiday in order to receive pay for the holiday unless:

(1)     Upon request by the Employer, a doctor's certificate or other satisfactory proof of illness is provided by the employee for the day(s) missed, or

(2)     The employee is scheduled to be off work for either day.

5

## SECTION 11. VACATIONS

(a)     Each employee who has been continuously employed by the Employer for the minimum period after completion of the probationary period stated in the schedule below shall be entitled to vacation with full pay as follows:

| Minimum Continuous Service | Maximum Accrued Vacation |
|---|---|
| 1 Year | 1 Week (40 hours) |
| 2 Years | 2 Weeks (80 hours) |
| 5 Years | 3 Weeks (120 hours) |
| 15 Years | 4 Weeks (160 hours) |
| 20 Years | 5 Weeks (200 hours) |

For purposes of this provision, "continuous" employment shall include employment by Clover Dairy, California Co-op and Stornetta Dairy, immediately prior to January 1, 1978. Vacation shall be earned at the rate of one-twelfth (1/12th) of the Maximum Accrued Vacation for each calendar month in which the employee works eighty (80) hours or more. Fractional days of credit shall be rounded to the nearest whole day. An employee who works eighty (80) hours or more in any calendar month shall also receive vacation credit for the following month, whether or not the employee works eighty (80) hours in that month, unless the employment terminates on or before the last day of the last month in which eighty (80) hours was worked. Paid holidays, paid vacation and paid medical leave of absence shall count as time worked.

(b)     All employees having an earned vacation of more than eighty (80) hours shall be entitled to two (2) weeks' vacation during the months between May 1st and October 1st, subject to seniority. Seventy-five percent (75%) of the employees in each department, on their first opportunity for selection, shall be guaranteed two consecutive weeks vacation during the months between May 1st and October 1st subject to seniority, provided they have an earned vacation of more than eighty (80) hours. However, any additional vacation time to which an employee is entitled under this section shall be taken at a time mutually agreed upon so there will be no adverse affect to the Employer's operation. This does not mean the Employer shall not give reasonable consideration to any employee upon request for a split vacation or the full earned vacation to be granted and taken consecutively.

(c)     The Employer and employee shall have the right to mutually agree to reschedule vacation in accordance with the other provisions of this section. If no mutual agreement is reached and the employee is required to work during his/her scheduled vacation, the employee shall be paid at one and one-half (1-1/2) times their basic hourly rate of pay for all straight-time hours worked during said scheduled vacation. The employee shall reschedule the unused portion of their vacation in accordance with provisions of this section. If agreeable to the employee, the employee shall be given the remainder of their vacation within thirty (30) days or at a time mutually agreeable.

(d)     The rate of pay for vacation time will be the employee's normal basic hourly rate of pay for time worked at each classification, including night shift or other premium if applicable.

6

(e)     Employees leaving after having been employed for not less than six (6) months shall receive a prorated vacation payment in accordance with the foregoing provisions.

(f)     Vacation must be taken unless mutually agreed to between Employer, employee and the Union.

(g)     Distribution of all vacation request forms for the following year will begin no later than November 1. Forms will be distributed to each employee by department or classification according to Company seniority within the designated vacation list. Each employee will be given a reasonable amount of time to make their selection. With their first opportunity for selection, each employee may select two (2) weeks of their choice provided they are eligible for at least two (2) weeks vacation. The next employee on the seniority list in that department will then have the same opportunity, and so on. This process will be repeated with each employee until all vacation requests are scheduled. All vacation must be scheduled. The Employer shall have the right to determine the number of employees on vacation based on operational needs.

(h)     Vacation shall be granted to employees within each of the departments or classifications in accordance with each such employee's seniority in the Company, except where an employee successfully bids to another department or classification the Company will try, but not be obligated, to meet the employee's scheduled vacation for that particular calendar year.

**Reference: November 14, 1991 letter of understanding.**

## SECTION 12. MEDICAL LEAVE OF ABSENCE

Every employee covered by this Agreement shall be entitled to medical leave of absence benefits under the following conditions:

(a)     Benefits shall be earned at the rate of eight (8) hours per month up to a maximum of ninety-six (96) hours in any contract year. Benefits can be accumulated to a maximum of four hundred eighty (480) hours.

(b)     Employees shall start earning benefits on the first (1st) day of the month following completion of the probationary period.

(c)     Medical leave of absence benefits shall be payable commencing the second (2nd) day of medical leave of absence. When an individual is hospitalized or covered under Workers' Compensation, benefits shall be payable commencing the first (1st) day.

(d)     Medical leave of absence benefit payments, including disability insurance or Workers' Compensation payments, for any week, shall not exceed an employee's normal weekly earnings at the basic hourly rate of pay, including night shift differential, if any.

(e)     Medical leave of absence benefits are payable only for an employee's regularly-scheduled workdays on which the employee is off sick.

7

(f)     The Employer may require a doctor's certificate or other satisfactory proof of illness or accident. Any employee returning to work after an absence due to injury or illness may be required to undergo a complete physical examination, including drug and alcohol testing, at the Employer's discretion.

(g)     Medical leave of absence benefits shall accrue only for employees who work eighty (80) hours or more in a calendar month.

## SECTION 13. LEAVE OF ABSENCE

It is agreed the Employer may give a leave of absence to any employee. Leaves of absence in excess of ten (10) working days must be in writing and approved by the Union and the Employer.

## SECTION 14. NIGHT SHIFT PREMIUM

All employees working between 6:00 P.M. and 6:00 A.M. shall receive fifty cents ($0.50) per hour above the basic hourly rate. When an employee works more than fifty percent (50%) of a straight-time shift between the hours of 6:00 P.M. and 6:00 A.M., the employee shall receive the night work premium for the entire shift.

## SECTION 15. WAGES

See Appendix A, attached.

## SECTION 16. UNIFORMS

(a)     The Employer shall furnish and launder all necessary uniforms, and employees shall be required to wear the uniforms provided. The Employer shall furnish uniform shorts for any driver who wants them.

(b)     The Employer shall furnish necessary aprons and gloves for plant employees on jobs where they are normally required.

(c)     The Employer shall attempt to have all uniforms laundered by union labor.

## SECTION 17. COMPANY MEETINGS

(a)     All employees governed by this Agreement shall be required to attend two (2) company meetings per month, if such meetings are called, provided that notice of such meeting is given at least twenty-four (24) hours in advance of the meeting time. Such meetings may include up to 4 educational programs per year, provided that the Employer shall reimburse employees for the reasonable and necessary cost of transportation to locations away from the Employer's facilities and, if necessary, for meals and accommodations. A maximum of twelve (12) meetings may be held during a contract year.

(b)     No employee shall be required to attend a company meeting on their day off or when on vacation, provided that an employee may be required, where necessary to take

8

011063.0001\748824.5

advantage of program availability, to attend educational programs on their day off pursuant to the previous paragraph.

(c)    Any time spent at a mandatory company meeting will be counted as time worked and the employee will be paid accordingly.

## SECTION 18.  BOND

Any Employer requiring a surety bond shall pay the premium for said bond.  No cash bond shall be required of any employee.

## SECTION 19.  PHYSICAL EXAMINATION

The Employer shall pay the cost of all physical examinations required of employees.

## SECTION 20.  CREDIT

All authorized credit shall be at the Employer's risk.

## SECTION 21.  DISCHARGE OR SUSPENSION

(a)    The Employer may discharge or suspend an employee for just cause, including violation of posted company rules, but no employee shall be discharged or suspended unless a written warning notice shall previously have been given to such employee of a complaint against the employee concerning his/her work or conduct, except that no such prior warning notice shall be necessary if the cause for discharge or suspension is theft, intoxication, use, sale or possession of illegal narcotics, gross insubordination or intentional destruction of company property, fighting, failing to report known safety violations or hazards, intentional falsification of any claim or of any documents relating to a claim of a work related injury or a Worker's Compensation Claim, or falsification of any claims or of any documents relating to a claim of medical leave of absence, adulteration of company food products or failure to report known or suspected adulteration of company food products.

(b)    The complaint specified in such prior warning notice need not concern the same type of misconduct as the cause for discharge or suspension.  No such warning notice shall remain in effect for a period of more than twelve (12) months.  A copy of such warning notice shall be sent to the local Union involved at the time it is given to the employee.

(c)    The Employer will mail written notice to the Union within three (3) working days following any discharge or suspension of an employee.  An employee may request an investigation of his/her discharge or suspension or any warning notice and the Union shall have the right to protest any such discharge, suspension or warning notice.  Any such protest shall be presented to the Employer in writing within ten (10) days, exclusive of Saturdays, Sundays and holidays, after the discharge, suspension or warning notice, and if not presented within such period, the right to protest shall be waived.  A copy of any such protest shall be given to the Employer.  Upon the filing of a protest, the matter shall be processed according to the dispute resolution procedure provided in Section 41.

9

## SECTION 22. LAYOFF NOTICE

The Employer shall give ten (10) calendar days' notice or ten (10) calendar days' salary in lieu thereof, to any employee who is to be laid off for lack of work.

## SECTION 23. HEALTH & WELFARE

(a) The Employer shall pay the sum of up to $783.00 per month for each eligible employee into the North Coast Trust Fund Plan 9T for the purpose of providing hospital, medical, dental, drug, vision and group life insurance.

(b) Subject to the following, it is agreed that the Employer shall not offer a schedule of benefits that is reduced below that level then currently offered under Plan 9T and further, that should additional contributions become necessary to maintain the level of benefits, the Employer shall contribute such additional amounts at times to be determined by the trustees of the North Coast Trust. However, nothing in this agreement shall be interpreted as providing a vested benefit or promise of future or continued benefits beyond the term of this agreement, whether for active participants or retirees and whether before or after commencement of coverage. The parties may modify, limit or terminate benefits at any time by mutual agreement.

(c) The obligation to maintain benefits shall not be interpreted to require payment of contributions or assessments beyond the term established by the parties to this agreement for payment of contributions to the North Coast Trust Fund Plan 9T. If, at any time, the parties hereto agree to change plans, the Employer shall not be liable to the trust fund for any cost of providing future benefits or increasing reserves for the coverage of participants remaining in the plan. This paragraph restates the intention of the parties under prior agreements; it does not impair the right of the North Coast Trust Fund to collect regular monthly contributions for work performed prior to the effective date of any change in coverage pursuant to the following paragraph (d) or termination of this agreement, but which do not become due until the following month, or to collect delinquent contributions if they are not discovered during the term of the agreement

(d) If the contribution rate to the plan increases more than ten percent (10%) in any year (measured from April 1 to March 31)("Contract Year") on a cumulative basis, the Employer shall have the right at any time thereafter and at its discretion to purchase one or more plans of hospital, medical, dental, drug, vision and group life insurance, to substitute such plan(s) for all employees covered by this agreement, and to discontinue contributions to North Coast Trust Fund Plan 9T, provided:

(1) Any substitute plan must provide an equivalent level of coverage, but may provide such coverage through one or more Health Maintenance Organizations, Individual Practice Associations, or Preferred Provider Organizations;

(2) No lapse in coverage occurs for any employee as a result of the change; and

(3) The Employer provides the Union with thirty (30) days written notice of the intended change.

10

The annual ten percent (10%) cap shall be calculated against a base of the greater of (i) the actual contribution rate for North Coast Trust Fund Plan 9T, or (ii) $783.00 per month. If the Employer is unable after a reasonable solicitation for proposals to obtain equivalent coverage from a responsible provider for an amount not exceeding the initial rate plus the annual ten percent (10%) cap, the Employer may require that employees pay from wages the amount of the monthly contribution exceeding the cap. Those payments may be required until such time as the cap again equals or exceeds the premium. The unused dollar amount of the annual cap, if any, will carry over from Contract Year to Contract Year until exhausted before the Employer may exercise its right under this paragraph (d) to purchase other coverage and discontinue contributions to North Trust Fund Plan 9T.

(e)    If an employee is absent because of an on-the-job or off-the-job injury or illness, the Employer shall continue to pay the required contributions (or provide the required coverage) until the employee returns to work.. However, such contributions (or coverage) shall not be paid (or provided) for a period of more than six (6) months beginning with the first month after contributions (or coverage) for active employment ceases. The Employer is relieved of the obligation to pay contributions during any period in which the eligibility rules of the Trust permit a waiver of contributions or premiums.

(f)    Contributions for employees will not be required until the first month following completion of the probationary period (see Section 27), but will be required for that month if the employee works eighty (80) hours in the previous month. If substitute coverage is provided, the eligibility requirements must be consistent with those existing under the North Coast Trust Fund Plan 9T.

## SECTION 24. PENSION

(a)    The Employer shall contribute to the Western Conference of Teamsters Pension Trust Fund on behalf of each employee covered by this Agreement. Such contributions required by this section shall be computed and paid from the first compensable hour worked by each employee. No contribution shall be required based upon overtime hours worked.

(b)    Time paid for but not worked, such as vacation, holiday, medical leave of absence, shall be counted as time worked for the purpose of this section.

(c)    The Employer agrees to accept and abide by the rules and regulations established or as may be established by the trustees of the fund. The total amount due for each calendar month shall be remitted in a lump sum and not later than the tenth (10th) day of the following month. Failure to make the payments herein provided within the time specified shall be a breach of this Agreement.

(d)    Contribution rates will be as follows:

(1)    Effective April 1, 2005, the Employer will make contributions for each employee covered by this Agreement to the Western Conference of Teamsters Pension Trust Fund at the rate of Three Dollars and Seventeen Cents ($3.17) per employee per each straight-time hour toward the basic pension, and will contribute an additional Twenty-One Cents ($0.21) per each employee per each straight-time hour toward the PEER 84, for a total contribution rate

11

of Three Dollars and Thirty-Eight Cents ($3.38) per each employee per each straight-time hour, not to exceed a maximum of two thousand eighty (2,080) straight-time hours per calendar year for any employee.

(2)     Effective April 1, 2006, the Employer will make contributions for each employee covered by this Agreement to the Western Conference of Teamsters Pension Trust Fund at the rate of Three Dollars and Twenty-Two Cents ($3.22) per employee per each straight-time hour toward the basic pension, and will contribute an additional Twenty-One Cents ($.21) per each employee per each straight-time hour toward the PEER 84, for a total contribution rate of Three Dollars and Forty-Three Cents ($3.43) per each employee per each straight-time hour, not to exceed a maximum of two thousand eighty (2,080) straight-time hours per calendar year for any employee.

(3)     Effective April 1, 2007, the Employer will make contributions for each employee covered by this Agreement to the Western Conference of Teamsters Pension Trust Fund at the rate of Three Dollars and Twenty-Seven Cents ($3.27) per employee per each straight-time hour toward the basic pension, and will contribute an additional Twenty-One Cents ($.21) per each employee per each straight-time hour toward the PEER 84, for a total contribution rate of Three Dollars and Forty-Eight and One-Half Cents ($3.48) per each employee per each straight-time hour, not to exceed a maximum of two thousand eighty (2,080) straight-time hours per calendar year for any employee.

(4)     Effective October 1, 2007, the Employer will make contributions for each employee covered by this Agreement to the Western Conference of Teamsters Pension Trust Fund at the rate of Three Dollars and Twenty-Eight Cents ($3.28) per employee per each straight-time hour toward the basic pension, and will contribute an additional Twenty-One Cents ($.21) per each employee per each straight-time hour toward the PEER 84, for a total contribution rate of Three Dollars and Forty-Nine Cents ($3.49) per each employee per each straight-time hour, not to exceed a maximum of two thousand eighty (2,080) straight-time hours per calendar year for any employee.

(5)     Effective April 1, 2008, the Employer will make contributions for each employee covered by this Agreement to the Western Conference of Teamsters Pension Trust Fund at the rate of Three Dollars and Thirty-Three Cents ($3.33) per employee per each straight-time hour toward the basic pension, and will contribute an additional Twenty-Two Cents ($.22) per each employee per each straight-time hour toward the PEER 84, for a total contribution rate of Three Dollars and Fifty-Five Cents ($3.55) per each employee per each straight-time hour, not to exceed a maximum of two thousand eighty (2,080) straight-time hours per calendar year for any employee.

(e)     The pension contribution rate includes the basic contribution and a contribution to the Program for Enhanced Early Retirement (PEER), which shall be at all times equal to 6.5 % of the basic contribution. The PEER contribution cannot be decreased or discontinued at any time unless the Employer completely withdraws from the Trust Fund with respect to this bargaining unit. The Employer's sole obligation under PEER shall be to make the agreed-upon PEER contribution, and nothing in this agreement or PEER shall in any way obligate the

12

Employer to pay any additional amount(s) beyond those amounts specified above, for any reason.

## SECTION 25. 401(k) PLAN

(a)    Effective April 1, 1997, the Employer agrees to participate in the Supplemental Income 401(k) Plan for Union Represented Employees of the Supplemental Income Trust Fund, a plan intended to conform to the requirements of Internal Revenue Code Section 401(k) for certain tax exempt, employee contributory plans.  The Employer's obligations to the Plan created by this Agreement are limited to:

(1)    The timely execution of the Plan's Subscriber Agreement;

(2)    The timely payment of that portion of wages that employees elect to pay into the Plan; and

(3)    The payment of the Plan's administrative fee of $4.00 per month for each employee who elects to participate in the Plan.  In the event the administrative fee is increased, the Employer's obligation shall not exceed a total of $8.00 per month.  In the event that the administrative fee is increased to more than $8.00 per month, the employees shall have the option to pay for the cost of the administrative fee in excess of $8.00 per month.  If the employees elect not to pay the administrative fee in excess of $8.00 per month, the Employer shall have the right to withdraw from the Plan.

(b)    Employee contributions will not be permitted for work performed before the first month following completion of the probationary period (see Section 27).

## SECTION 26. RIDERS ON TRUCKS

No one but employees covered by this contract, with the exception of the plant manager, sales manager, supervisors acting in their respective capacities, or any other individuals so permitted or instructed by management shall accompany drivers on their routes.

## SECTION 27. SENIORITY AND PROBATIONARY PERIOD

(a)    Layoffs, including layoffs caused by elimination of jobs, shall be made in the reverse order of seniority, if the employees having seniority are capable of performing the remaining jobs.  An employee who is to be laid off shall have the right to displace the junior employee in the same tier of the same department, provided the employee is capable of performing the job.  The displaced employee shall have the right to displace the junior employee in the next lower tier provided the employee is capable of performing the job.  Where more than two tiers exist in a department, the same procedure shall apply until there is no further tier in that department to which a displaced employee in a higher tier may elect to move.  The last employee in the department displaced by this process may displace the lowest seniority person in the company provided the employee is capable of performing the job.  The person displaced shall be the person laid off.  For purposes of this Section 27, the terms "tier" and "department" refer to the departments and wage tiers defined in Appendix A, attached.

13

(b)     Seniority lists shall be submitted to the Union on request and a copy posted on the bulletin board not more often than once every six (6) months. Any question concerning application of seniority under this section may be reviewed as provided in Section 41.

(c)     Seniority shall be broken if an employee quits, is discharged, or is laid off for lack of work for more than one (1) year, or if an employee has failed to report back for work within three (3) calendar days after being notified to do so, provided that a written notice was sent by certified mail to the employee at his/her last address on file with the Employer.

(d)     An employee shall not acquire seniority during a probationary period consisting of the first one hundred twenty (120) days of employment, provided that if an employee is employed more than one hundred twenty (120) days, the employee's seniority shall commence with the date of hire. The probationary period is the time for the employee to learn the job and adapt to work requirements, and for the Employer to evaluate the skill, commitment and adaptability of the employee. The Employer shall be the sole judge of the qualifications of workers during the probationary period, provided that the Employer may not unlawfully discriminate against the employee in violation of Sections 5, 34 or 47 of this Agreement. A probationary employee shall not accrue medical leave of absence, holiday, vacation, 401(k) or health and welfare benefits during the probationary period.

(e)     Seniority shall be broken if the condition of an employee on leave of absence due to injury or illness becomes permanent and stationary and the employee is unable to perform bargaining unit work with reasonable accommodation consistent with the Americans with Disabilities Act within three (3) months from the date that the employee's condition is found to be permanent and stationary.

## SECTION 28. VISITS BY UNION REPRESENTATIVES

Authorized representatives of the Union will be admitted to the Employer's plant at reasonable times to assist in settlement of grievances and to observe the administration of the contract. This privilege will be observed so as not to interfere unnecessarily with the normal work.

## SECTION 29. BULLETIN BOARD

The Union may use the Employer's bulletin board for the purpose of posting Union notices.

## SECTION 30. TIME CLOCKS

The Employer shall provide a means of registering the reporting and quitting times, records of which shall be made accessible to the Business Representative of the Union upon request. In the event the Employer's timekeeping system is not satisfactory, the Employer shall then install time clocks.

14

## SECTION 31. VEHICLES

No employee shall be required to furnish the Employer with a vehicle to be used in the delivery of goods in connection with his/her employment.

## SECTION 32. MAINTENANCE OF STANDARDS

Except as otherwise expressly provided herein, the parties agree that the wages, fringe benefits and conditions for all employees performing work under this agreement shall be maintained during the term of this agreement at not less than the standard provided herein, unless amended in writing. The agreement shall not be modified by inadvertent errors or omissions by the Employer or the Union in its administration and enforcement.

## SECTION 33. MEAL PERIODS AND REST PERIODS

(a)     The employer will allow for, and each employee shall be required to take, a meal break of thirty (30) minutes commencing not more than five (5) hours after beginning his/her shift. All work performed after five (5) consecutive hours without receipt of meal time off shall be compensated for at the rate of time and one-half (1-1/2) times the employee's basic hourly rate of pay, including any applicable night shift differential.

(b)     If an employee is working off site, or if an on-site employee chooses not to punch in and out for a meal break, then upon punching out for the day that employee must mark his/her time card accordingly stating the length of the meal break taken. The Employer may require that an employee or group of employees punch in and out for meal breaks.

(c)     The employer will allow for, and each employee shall be required to take, two rest periods consisting of ten (10) minutes each during the course of his/her shift. One rest period will be taken in the first half of the shift and the other rest period will be taken in the second half of the shift.

## SECTION 34. PROTECTION OF RIGHTS

It shall not be a violation of this Agreement, and it shall not be cause for discharge or disciplinary action:

(a)     In the event an employee refuses to go through or perform any services behind any lawful primary picket line at a place of business of any other employer where the employees of such employer are engaged in a strike ratified or approved by the Union of such employees whom such employer is required to recognize; or

(b)     In the event an employee refuses to perform any services behind a lawful primary picket line at the premises or places of business of their Employer, including such picket lines of the Union party to this Agreement; provided, however, that the refusal to perform such services shall be confined to the Employer or to the product of the Employer which is the object of such picket line. Such lawful primary picket lines shall be sanctioned by the Local Labor Council or Teamsters Joint Council No. 7.

011063.0001\748824.5

(c)    In the event of picketing which occurs at an Employer's plant work will continue for a period of seventy-two (72) hours for the purpose of removing perishable products from the plant.

## SECTION 35.  WORK IN TWO OR MORE CLASSIFICATIONS

(a)    Where an employee is required to work in more than one classification during a workday the employee shall be classified and paid under that classification which pays the highest wage.

(b)    Where an employee is required to relieve two or more different jobs, the employee shall receive the relief rate.

## SECTION 36.  DONATIONS

An Employer shall not require donations or contributions from employees.

## SECTION 37.  PROTECTIVE CLOTHING

The Employer shall provide, and employees shall wear, the necessary aprons and gloves normally required to perform a given job, together with such other safety equipment as may be required by law.

## SECTION 38.  PAY DAYS

(a)    All employees covered by this Agreement will be paid at least every two (2) week period unless the Employer elects to pay semi-monthly.

(b)    If the employer elects to pay semi-monthly, all employees covered by this Agreement will be paid on the seventh (7th) and twenty-first (21st) day of each month. Employees will be paid on the last workday prior to any payday which would otherwise fall on a weekend or holiday (other than a floating holiday).

## SECTION 39.  REMITTANCE ADVICE

The stub accompanying an employee's paycheck shall separately state the following items: Regular hourly pay, overtime, social security, disability insurance, withholding tax, and any other deductions authorized by the employee.

## SECTION 40.  HANDICAPPED EMPLOYEES

The Employer, with the approval of the Union and the employee involved, shall have the right to adjust hours and wages in the case of any employee who, because of physical disability, is unable to accomplish a satisfactory day's work.

## SECTION 41.  ARBITRATION

(a)    It is the desire of both parties to this Agreement that all disputes arising out of the Agreement shall be settled amicably. For this purpose it is hereby agreed that when mutual

16

adjustment in such matters cannot be arrived at by the parties to this Agreement, or their representatives, both parties shall proceed to create a Board of Adjustment for the purpose of submitting to it such matters of difference.

 **(b)** A grievance shall include any difference of opinion or dispute between the Employer and the Union or any employee covered by this Agreement regarding interpretation of this Agreement.

 **(c)** Except as otherwise provided in Section 20, a grievance must be filed in writing with the Employer within thirty (30) days after the known occurrence of the act which resulted in the grievance (except that claims which are strictly money claims must be filed within forty-five (45) days of occurrence). Failure to file a grievance in writing as provided will relieve the Employer and the Union of all obligations, financial or otherwise, which might otherwise have resulted.

 **(d)** The parties will attempt to resolve the dispute informally, but if they are unable to do so, either party may submit the matter to the Board of Adjustment within sixty (60) days after notice of the grievance is first received by the responding party. This time limit may be extended in an individual case by written agreement of the parties.

 **(e)** The Board of Adjustment shall be composed of two (2) representatives appointed by the Employer and two (2) representatives appointed by the Union. A majority vote of all members of the Board shall be necessary for any action.

 **(f)** In the event of a deadlock by the Board of Adjustment, either party may refer the matter to a neutral arbitrator. Except as the parties may otherwise agree in writing, such a referral will not be timely unless requested in writing within thirty (30) days of the decision deadlocking the Board. If the parties cannot agree on the selection of an arbitrator, a list of five (5) arbitrators shall be obtained at the earliest possible date from the Federal Mediation and Conciliation Service. The parties will toss a coin to decide who shall move first, and they shall then proceed alternatively to strike names from the list until one remains. The last named person shall be selected as the arbitrator. If the person selected is not available to serve, the last name stricken will be the first alternate, and if that person is unavailable to serve, the next to last name stricken will become the second alternate, and so on.

 **(g)** The decision of the Board or the neutral arbitrator upon the matter submitted to it shall be final and conclusive and binding upon all parties hereto, who agree to abide thereby. Pending final settlement of a dispute in accordance with the provisions of this section there shall be no cessation of, or interference with, work whether by strike, lockout, intentional slowdown or other deliberate curtailment.

 **(h)** All expenses of the arbitration shall be borne jointly by the Employer and the Union except for those individual expenses which either the Employer or the Union may incur for the purposes of putting on their respective cases.

## SECTION 42. LICENSES

The Employer agrees to pay for licenses that may be required for the performance of production workers' jobs .

## SECTION 43. IMPROPER SOLICITATION

It is agreed for the purposes of elimination of improper solicitation that the Employer shall not assign a driver to a route or permit such driver to serve or solicit a route which includes all or a majority portion of a route which such driver has served for a former employer until such driver has been in the new employment for at least one (1) year.

## SECTION 44. TRANSFER OF COMPANY TITLE OR INTEREST

The Employer shall give written notice of the existence of this agreement to any purchaser, successor, lessee or assignee of the operation covered by the Agreement or any part thereof. The affected Union shall be notified in writing of any change in operations and shall be given a reasonable opportunity to discuss the matter with the purchaser, successor, lessee or assignee before the actual change in operations takes place.

## SECTION 45. JURY DUTY

(a)     The Employer shall reimburse any employee for any loss in wages caused by such employee performing jury duty for up to eighty (80) hours per calendar year.  Any employee scheduled for jury duty shall be temporarily rescheduled as a day shift employee.

(b)     When an employee is on call for jury duty subject to actually being required to be physically present, the employee and the Employer may mutually agree temporarily to an alternative work schedule for the time frame of such on-call status.

## SECTION 46. BEREAVEMENT LEAVE

An employee who loses time on scheduled workdays on account of the death of an immediate family member will be paid up to three (3) days (twenty-four (24) hours for an employee scheduled for eight (8) hour shifts, and thirty (30) hours for an employee scheduled for ten (10) hour shifts) for working time lost as a result of attendance at the funeral.  Up to five (5) days (to a maximum of 40 hours) will be paid when the funeral occurs out of state.  A member of the employee's immediate family is defined as spouse, brother, sister, father, mother, father-in-law, mother-in-law, son, daughter, grandparent, or other relatives living in the employee's home.

## SECTION 47. EQUAL EMPLOYMENT OPPORTUNITY

No employee or applicant for employment covered by this Agreement shall be discriminated against because of membership in a Union or activities on behalf of the Union, and the Union agrees that employees covered hereby shall be admitted to membership without discrimination.  Neither the Employer nor the Union shall discriminate for or against employees or applicants for employment covered by this Agreement on account of sex, race, creed, color,

18

religion, age or physical or mental disability to the extent provided by law.  Both parties agree to abide by the Federal and State Fair Employment Practices Acts.

## SECTION 48.  JOB BIDDING

(a)      All openings for existing plant classifications or routes will be posted for a period of five (5) consecutive working days at the location at which the work is to be performed (or, for routes, at the location where the route commences).  All employees who are interested will put their names in the job bid box.  The job bid box will be opened by the Human Resources Director or his designate and a union employee.  Together they will record the names of the bidders and the names will be listed in order of seniority.

(b)      The H.R. Director and the supervisor of the job in question will interview the first five employees on the list to discuss the job and its requirements and to determine the qualifications of each of the individuals.  The Employer shall have the right to award the job to the person who, in its sole discretion, is most qualified to perform the work, and the exercise of that discretion shall not be subject to the grievance procedure.  However, the Employer recognizes the concept of promotion by seniority and agrees to apply seniority as the selection criteria between employees whom it deems to be otherwise equally qualified.  Before the decision is made final, if anyone other than the senior bidder is the leading candidate, then the H.R. Director will meet with any of the senior bidders who were not the leading candidate to inform them of the Employer's intentions and to give them another opportunity to state their qualifications.  Once the decision is final, the list of the names of those bidding on the job will be posted and the name of the person selected for the position will also be identified as such.  The Employer agrees to meet with the Union upon the Union's request to discuss the reasons why any bidder is passed over and that employee's rights as a seniority person, but the decision to award work to someone other than the senior bidder shall not be subject to arbitration under Section 41.  The Employer need not give consideration to any bid by an employee who has successfully bid on a job within the preceding twelve (12) month period.  Any vacancy resulting from the bid will be filled by assignment or hiring a new employee.

## SECTION 49.  ALCOHOL AND DRUG USE

(a)      Where the Employer has reasonable cause to believe that an employee is intoxicated or under the influence of alcohol or illegal or illicit drugs, or the employee is under the influence of prescription drugs or other medications the current use of which has not been reported by the employee to the Employer and which would impair the employee's performance, or where the Employer reasonably believes that an employee has consumed alcoholic beverages or intoxicating drugs on the job, the Employer shall request in the presence of a shop steward or other available witness that the suspected employee go to a medical clinic and give blood and urine specimens.

(b)      A refusal to give specimens shall create a presumption of intoxication and shall establish an independent basis for immediate removal from the job and termination of employment.  If the chemical analysis meets or exceeds the legal standard for intoxication under the motor vehicle laws of the State of California, then it shall be conclusively presumed that the employee is intoxicated and shall result in the employee's termination.  Any other finding of the

use of illicit drugs or alcohol on the job or affecting the employee's performance shall be the basis for discipline up to and including discharge. Copies of the results of any chemical analysis shall be provided to the Union.

## SECTION 50. ALCOHOL AND DRUG REHABILITATION

(a)    An employee with seniority shall be permitted to take a reasonable leave of absence for the purpose of undergoing treatment pursuant to an approved program of rehabilitation for drug or alcohol abuse, provided that the leave is requested prior to commission of any related act which subjects the employee to disciplinary action. Such leave of absence shall be without pay and shall not exceed a thirty (30) day period unless extended by mutual agreement for an additional thirty (30) days. Such leave shall be on a one-time basis, after which further evidence of drug or alcohol abuse will be grounds for termination.

(b)    While on such leave, the employee shall not accrue fringe benefits i.e., pension, health and welfare, vacation, holidays or medical leave of absence, though the employee may pay through the Employer for continued health and welfare coverage if permitted by the trust fund to which the employer contributes under Section 23 of this Agreement. Funeral leave and jury duty shall not be payable on account of events occurring during the leave.

(c)    Employees requesting to return to work shall be required to submit to reasonable periodic testing for a period not to exceed two (2) years. Failure to comply with those conditions shall result in the employee's immediate removal from the job and termination of employment. Such cases shall be subject to the grievance procedure only to the extent that there may be a question whether the conditions for return to work have been violated. Also see Appendix B attached.

## SECTION 51. DUES CHECK-OFF

(a)    The Employer agrees to deduct Union dues monthly from the wages of employees in the bargaining unit who provide the Employer with a voluntary written authorization for such deductions. Such deductions, when authorized, shall instead be transmitted to the office of the Local Union by the tenth (10th) day of the month following the month in which deductions are made. Commencing with and for the calendar month following the month in which this Agreement is executed by all parties, such deductions, when authorized, shall be transmitted to the office of the Local Union by the twentieth (20th) day of the month in which deductions are made. No deductions will be made from the wages of any employee until after the Employer has received a signed copy of such authorization.

(b)    Authorizations for deductions are to be entirely voluntary upon the part of each such individual employee and shall be irrevocable for a period of one (1) year or until the termination of this agreement, whichever occurs sooner.

(c)    The Union shall indemnify and hold the Employer harmless against any and all liability and/or litigation expense arising out of any claim, administrative proceeding or action resulting from implementation of this provision.

20

011063.0001\748824.5

## SECTION 52.  TERM OF AGREEMENT

This Agreement shall become effective April 1, 2005.  It shall remain in effect until March 31, 2009, and shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to terminate or modify said Agreement at least sixty (60) days prior to March 31, 2009.

FOR THE EMPLOYER:                          FOR THE UNION:

CLOVER STORNETTA FARMS, INC.               GENERAL TRUCK DRIVERS,
                                           WAREHOUSEMEN & HELPERS UNION,
                                           LOCAL NO. 624

_____           _____
Kevin Imm, CEO                             Bob Carr, Secretary-Treasurer

_____           _____
Herm Benedetti, Vice-President,            Ralph Miranda, President and Agent
Human Resources

21

# APPENDIX  A

### CLOVER-STORNETTA FARMS, INC.
### WAGE CLASSIFICATIONS  HOURLY RATE

## APPENDIX A

### CLOVER STORNETTA FARMS, INC.
### WAGE CLASSIFICATIONS  HOURLY RATE

| | April 1 2005 Wage | April 1 2006 Wage | April 1 2007 Wage | April 1 2008 Wage |
|---|---|---|---|---|
| **PRODUCTION**[1] | | | | |
| Lead Foreperson | 24.56 | 25.11 | 25.66 | 26.26 |
| Foreman | 22.56 | 23.11 | 23.66 | 24.26 |
| Tier 1 | 20.86 | 21.41 | 21.96 | 22.56 |
| Tier 2 | 20.36 | 20.91 | 21.46 | 22.06 |
| Tier 3* | 17.66 | 18.21 | 18.76 | 19.36 |
| Vacation Relief | 20.86 | 21.41 | 21.96 | 22.56 |
| | | | | |
| **DISTRIBUTION** | | | | |
| Lead Foreperson | 24.56 | 25.11 | 25.66 | 26.26 |
| Foreman | 22.36 | 22.91 | 23.46 | 24.06 |
| Tier 1 | 20.36 | 20.91 | 21.46 | 22.06 |
| Tier 2* | 17.66 | 18.21 | 18.76 | 19.36 |
| Vacation Relief | 20.86 | 21.41 | 21.96 | 22.56 |
| | | | | |
| **DRIVERS** | | | | |
| Lead Foreperson | 24.56 | 25.11 | 25.66 | 26.26 |
| Tier 1 | 20.58 | 21.13 | 21.68 | 22.28 |
| Tier 2* | 19.58 | 20.13 | 20.68 | 21.28 |
| Tier 3* | 17.66 | 18.21 | 18.76 | 19.36 |
| Vacation Relief | 21.08 | 21.63 | 22.18 | 22.78 |

---

[1] Job descriptions found in  Appendix A-1.

| | April 1 2005 Wage | April 1 2006 Wage | April 1 2007 Wage | April 1 2008 Wage |
|---|---|---|---|---|
| **ORDER ENTRY** | | | | |
| Tier 1 | 19.87 | 20.42 | 20.97 | 21.57 |
| Tier 2* | 17.66 | 18.21 | 18.76 | 19.36 |
| | | | | |
| **MAINTENANCE** | | | | |
| Lead Foreperson | 26.00 | 27.00 | 28.00 | 29.00 |
| Tier 1 | 24.00 | 25.00 | 26.00 | 27.00 |
| Tier 2* | 22.00 | 23.00 | 24.00 | 25.00 |

| 2 Year Maintenance Apprentice Program | 0-5 mos. | 6-11 mos. | 12-17 mos. | 18-23 mos. | From 24 mos. |
|---|---|---|---|---|---|
| Salary % of Maintenance Tier 2 | 80% | 85% | 90% | 95% | 100% |

Starting wages for new employees shall be Two Dollars ($2.00) below the rate for the appropriate classification, increasing by Fifty Cents ($0.50) each three (3) months thereafter until the scheduled rate is achieved. These increases shall be in addition to increases occurring on April 1, 2005, April 1, 2006, April 1, 2007, , and April 1, 2008 for all classifications.

The previous paragraph will not apply to classifications (tiers) marked with an asterisk (*) or to employees while participating in the Two-Year Maintenance Apprenticeship Program. However, an employee moving from a classification showing an asterisk to another classification under this Agreement shall be subject to those starting wage provisions. For example, for employees in asterisked classifications who have at least six months of continuous employment with Clover-Stornetta Farms and who bid successfully into a higher-paying classification, starting wages in the new classifications shall be Two Dollars ($2.00) below the rate for the appropriate classification, increasing by Fifty Cents ($0.50) each three (3) months thereafter until the scheduled rate is achieved. Provided, that if there is less than a Two Dollar ($2.00) differential between the rate of an asterisked classification and the higher-paying classification into which the employee is bidding, the employee will remain at the existing rate during the first three (3) month period, with the rate increasing by one-third (1/3) of the differential between the starting rate and the rate for the higher paying classification for each three (3) months thereafter until the rate for the higher-paying classification is reached. These increases shall be in addition to increases occurring on April 1, 2005, April 1, 2006, April 1, 2007, and April 1, 2008 for all classifications.

011063.0001\748934.4

CLOVER-STORNETTA FARMS, INC.

## APPENDIX A-1
## WAGE CLASSIFICATIONS – DEFINITION OF TIERS

### Production Department

**Lead Foreperson**   Responsible for daily operation of Production Department as well as tasks assigned by Production Manager. Reports to Production Manager. Proficient in and has the ability to perform all jobs in tiers below the Foreperson level.

**Foreperson**   Proficient in and has the ability to perform all jobs in tiers below the Foreperson level. Has responsibility for and is the lead for their respective shift.

**Tier 1**   Includes:

- Pasteurizer/Receiver - Pasteurizer has pasteurizer's license. Processing is their primary job or their primary job requires a pasteurizers license.

- Receiver has weigher's/sampler's license and a valid class-A driver's license and receiving is their primary job.

**Tier 2**   Proficient in and has the ability to perform clean-up on all machines. Knows and can operate proficiently all bottling machines. This is their primary job and they are operating bottling machinery over 75% of the time.

**Tier 3**   Entry Level

### Distribution Department

**Lead Foreperson**   Responsible for daily operation of Distribution Department as well as tasks assigned by Distribution Manager. Reports to Distribution Manager. Proficient in and has the ability to perform all jobs in tiers below the Lead Foreperson level.

**Foreperson**   Must have a class-A license. At least 2 years service in CSF Distribution Department or equivalent experience. Has a working knowledge of all of the jobs in Tier 1. Proficient in and has the ability to perform all jobs in Tiers 2, 3 and 4 below. Has responsibility for and is the lead for their respective shift.

**Tier 1**   At least 1 year of service in CSF Distribution Department or equivalent experience. Proficient in and has the ability to perform all distribution skill sets while performing Loader/Shipping job and/or Order Puller job at least 50% of the time.

4

CLOVER-STORNETTA FARMS, INC.

Tier 2          Entry Level

**Drivers**

**Lead Foreperson**    Must have a valid class-A license and a working knowledge of all of the tiers below. Responsible for the scheduling of all drivers and route efficiencies.

**Tier 1**        Class A or B license required and employee is running a route that is not a school route at least 75% of the time.

**Tier 2**        School Route (Class B license required)

**Tier 3**        Special Deliveries

**Maintenance Department**

**Lead Foreperson**    Minimum 7 years production maintenance repair experience with two years lead experience. Responsible for maintenance repair, scheduling, training and day-to-day plant maintenance operations. Reports to Plant Maintenance Manager.

**Tier 1**        At least 5 years production maintenance repair experience. Must have certificates for completed classes in at least 3 of the areas listed below or must be skilled in all of the areas listed below:

- Welding

- Electrical

- Pneumatics

- Hydraulics

- Refrigeration

- Preventive Maintenance

**Tier 2**        Minimum 2 years in plant maintenance repair and/or has successfully completed the CSF Maintenance Apprenticeship Program or equivalent experience.

**Apprentice**    Employee will be given specific goals and objectives to achieve for each six month interval. Employee will be evaluated every six months to determine whether those goals and objectives have been met. If the goals and objectives

CLOVER-STORNETTA FARMS, INC.

have been met, then the employee will be granted the appropriate wage increase for that level of apprenticeship.

**Order Entry**

Tier 1     In addition to the qualifications for Tier 2, the Employee will perform and be proficient in assigned responsibilities including, but not limited to, printing, mailing and distributing week- and month-month end statements and administration of route cards, daily fax sheets, order guides and scan sheets. The Employee shall also print the inventory and route sheets for Pleasant View Dairy.

Tier 2     Employee will perform data entry and have proficiency by touch at 10-key data entry, keyboard operation at a minimum of 45 words per minute, basic math skills, telephone etiquette, and taking distributor orders.